196 N.J. Super. 174 (1984)
481 A.2d 1166
JEANETTE PERNO, PETITIONER-RESPONDENT, CROSS-APPELLANT,
v.
ORNSTEIN FASHIONS, INC., RESPONDENT-APPELLANT, CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 1984.
Decided September 12, 1984.
*175 Before Justice SULLIVAN and Judges KING and BILDER.
Daniel J. Pomeroy, argued the cause for appellant, cross-respondent (Connell, Foley, & Geiser, attorneys; George J. Kenny, of counsel).
Louis David Balk, argued the cause for respondent, cross-appellant (Balk & Balk, attorneys).
The opinion of the court was delivered by KING, J.A.D.
This workers' compensation appeal concerns the application and construction of N.J.S.A. 34:15-7.2; L. 1979, c. 283, § 3 which states
In any claim for compensation for injury or death from cardiovascular or cerebral vascular causes, the claimant shall prove by a preponderance of the credible evidence that the injury or death was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of the claimant's daily living and in reasonable medical probability caused in a material degree the cardiovascular or cerebral vascular injury or death resulting therefrom.
Material degree means an appreciable degree or a degree substantially greater than de minimis.
This section was one part of a 1979 legislative effort to reform our Workers' Compensation Act.
The general purpose of the legislative reform, as expressed in the Joint Statement of the Senate and Assembly Labor, Industry and Professions Committees, was articulated as
This bill is a revision of New Jersey's Workers' Compensation Law and would make available additional dollars for benefits to seriously disabled workers while eliminating, clarifying or tightening awards of compensation based upon minor permanent partial disabilities not related to employment.
This bill would put significantly more money into the hands of the more seriously injured workers while providing genuine reform and meaningful cost containment for New Jersey employers from unjustified workers' compensation costs that are presently among the highest in the nation.
The legislative purposes of these reforms have been specifically recognized and discussed by our Supreme Court in two recent *176 decisions concerning permanent disability claims which were unrelated to cardiovascular or cerebral vascular causes. See Poswiatowski v. Standard Chlorine Chemical Co., 96 N.J. 321, 328 (1984); Perez v. Pantasote, Inc., 95 N.J. 105, 111-114 (1984). To generalize, the legislation increased monetary awards for serious injuries but made recovery for lesser injuries more difficult.
As to cardiovascular claims the Joint Statement said
The legislation would benefit employers by: ...
(2) countering the far-reaching effects of Dwyer v. Ford [36 N.J. 487 (1962)] in cardiac claims by requiring that a petitioner prove that the injury or death involved substantial effort or strain which was in excess of the rigors of the claimant's daily living and that the cause of the injury or death was job-related in a material degree; ...
As we noted in dictum in Williams v. Western Electric, 178 N.J. Super. 571, 579 n. 3 (App.Div. 1981), "after 17 years of experience with the Dwyer rule in the heart and cerebral accident cases, the Legislature, in the revision of 1979 (L. 1979, c. 282, § 3, eff. Jan. 10, 1980), swung the pendulum in the opposite direction."
Against this background we examine the issue on this appeal: Was the award of 7 1/2% permanent partial total disability for an angina episode experienced by the petitioner while at work sustainable on this record under the 1979 amendment?
On July 31, 1981 the petitioner filed a claim petition against Ornstein Fashions, Inc. She alleged in her petition that as a piece-work sewing-machine operator she was "exposed to repetitive stress and strain" and sustained injuries that were "cardiac, internal, pulmonary and neuropsychiatric in nature." Compensability was denied by her employer.
The facts developed at the Division hearing were that petitioner, age 56, had been employed by appellant as a sewing machine operator from October 1979 until August 8, 1980  the date of the claimed compensable angina episode. She had sewed pockets into garments at piece-work rates. She had done this type of work for over 40 years. Petitioner said that *177 her work required her to carry bundles of fabrics weighing 35 pounds three or four times a day. The respondent's principal, Harvey Ornstein, claimed that the bundles weighed three to five pounds only and they were usually carried for petitioner by others but if she desired, she could pick them up and carry them herself about 15 feet to her machine. The judge did not specifically resolve the issue of the weight of the bundles because in this context "whether or not she had to carry a bundle which was five pounds or thirty-five pounds does not actually seem to make much difference."
Petitioner had first experienced angina in 1975, before her employment with Ornstein; had used nitroglycerin since then, was under medical care and also was taking librium before the events of August 7, 1980. On that day she started work at 7 a.m. At about 9:30 a.m. she began experiencing chest pains. She took her nitroglycerin without relief. She went to her foreman at 11 a.m. and told him of the persistent pains. He allowed her to go home and she reported to her doctor. She was taken to the Riverside Hospital where she stayed for one week. On discharge the final diagnosis noted was: "chest pains of undetermined etiology, possible angina pectoris, urinary tract infection, anxiety, and exogenous obesity." Petitioner also admitted suffering from colitis and an hiatal hernia. She was referred to the Deborah Heart and Lung Center for cardiac catheterization. She did not return to work again and was receiving $360 per month in Social Security disability benefits and $120 per month in union disability benefits.
Petitioner presented two experts. Her internal medical expert, Dr. Silberner, diagnosed petitioner as suffering from an arteriosclerotic heart, coronary insufficiency, myocardial ischemia, angina pectoris on ordinary exertion, and chronic bronchitis. He found 65% partial total cardiac and 20% partial total pulmonary disability but regarded her as 100% disabled "as an industrial unit." In response to the hypothetical question put by petitioner's lawyer, he opined that petitioner's "present disability is causally related to her employment by way of *178 aggravation and acceleration of an underlying condition which preceded August 8th of 1980." Dr. Goldberg, a psychiatrist, also testified for petitioner and diagnosed "anxiety neurosis with cardiaphobia," estimating this disability at 20% of total.
Two experts spoke for the respondent-employer: Dr. Lewis, a cardiologist, and Dr. Effron, a neuropsychiatrist. Dr. Lewis identified petitioner's condition as "angina due to arteriosclerotic coronary artery disease with a disability of approximately 20% of total." He found no evidence of pulmonary disability and no relationship between petitioner's employment and her heart disease or disability. Dr. Effron found no employment-related neuropsychiatric disability. At the conclusion of the testimony the judge of compensation expressed these findings:
Of course, we have the two interpretations of the doctors as to whether or not there was any aggravation since there can be no recovery without an aggravation. This is so since both doctors and the records clearly show the Petitioner had a pre-existing underlying arteriosclerotic heart disease or coronary artery disease which was causing her symptoms and for which she was receiving treatment, and unless that was aggravated by the work episode, there is no compensable disability. The description that the Petitioner gives us of the work she was doing and whether or not she had to carry a bundle which was five pounds or thirty-five pounds actually does not seem to make much difference. The descriptions of her past history with occasional pains relieved by nitro and the continuing episodes which she still has even now on exertion is typical of a progression of the underlying disease, and in my mind, at least, this pain on August 7th, which I find she did actually have and caused her to have to be hospitalized, was a result of the underlying disease together with whatever effort she did expend at that time that the pain came on.
I do not and cannot accept Dr. Silberner's conclusion that because she had more severe pain after this incident, it was aggravated because it is the nature of the disease that it gets to the point where the arteries are so narrowed that there can no longer be sufficient blood flow to the heart to carry on even ordinary tasks. This is due to the progression of the disease, not to the effort which was expended which coupled with it caused the pain.
I am satisfied from all the evidence that she did have, in fact, an episode of chest pain while she was working and that she probably, because she was on piece work, went to get her own bundles, whether they were five pounds or thirty-five pounds, and was probably working fast to make production to get paid, and I am sure that she had a regular pace which she had developed over the years, and she said she made about one hundred a day which, apparently, give her a salary with which she was satisfied and would have to be active and work steady. I am satisfied that the Petitioner had preexisting arteriosclerotic heart disease which was progressive in nature, that this morning the effort she put out was such that it was substantial enough to cause a more severe pain *179 and cause her to stop work. She didn't have it before, apparently, she wasn't putting out the effort or expending the effort. So I find that was greater than the normal and that she did, therefore, have a coronary insufficiency.

I know that Dr. Lewis says that coronary insufficiency leaves no damage and that is so and that has been the testimony of doctors over the past years in these cases, and it is also true that they are still considered an entity and that disability has been allowed for it in the past.
I find the Petitioner meets the terms of the statute as far as coronary attack is concerned and that the residuals of the insufficiency for the pain caused by it, which did not in any way cause, aggravate, accelerate or exacerbate the underlying condition, entitled Petitioner to a permanent disability of seven and one half percent of the partial total. [Emphasis supplied].
The judge allowed compensation for the costs of the week's treatment at the Riverside Hospital but found that "any further treatment for catheterization or anything is due to the underlying disease and not related to this incident, so that Deborah Hospital is not related or any doctors there and there is no future medical." He allowed eight weeks of temporary disability at $185 or a total of $1,480. He felt that she probably could have returned to light work, if she desired. He found no compensable pulmonary disability. The 7 1/2% of total permanent disability award amounted to $2,115 ($47 X 45 weeks). This appeal, as noted, is taken only from the 7 1/2% permanent partial total award.
We conclude that the evidence presented and the judge's findings do not sustain the award of 7 1/2% permanent disability. At best, on this record, petitioner suffered a transitory angina episode coincident to her long-standing, underlying disease process. We find nothing to satisfy the requirement of N.J.S.A. 34:15-7.2 that petitioner "prove by a preponderance of the credible evidence that the injury ... was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of the claimant's daily living" which "in reasonable medical probability caused in a material degree the cardiovascular ... injury resulting therefrom." And, of course, we must not overlook the final sentence of N.J.S.A. 34:15-7.2 which states: "Material degree means an appreciable degree or a degree substantially greater than de minimis."
*180 Indeed, this appears to be the very type of case the Legislature envisioned as noncompensable when it expressed in the Joint Statement the desire to counter the "far-reaching effects of Dwyer v. Ford" and require "that petitioner prove that the injury involved a substantial strain or effort in excess of the rigors of ... daily living" and that the cause of injury "was job-related in a material degree." Here there was no triggering event from either normal or excessively abnormal work-related activity. Petitioner had a clear-cut history of progressive, degenerative heart disease. The judge specifically rejected the theory of aggravation espoused by petitioner's expert and specifically accepted respondent's expert's conclusion that the coronary insufficiency caused by angina "leaves no damage" and "did not in anyway cause, aggravate, accelerate or exacerbate the underlying condition."
The history of the compensability of heart disease in this State sheds light on our decision today. Prior to 1958 cardiovascular claims for workers' compensation were evaluated under the so-called "unusual strain" rule. See Seiken v. Todd Dry Dock, Inc., 2 N.J. 469, 476 (1949). This standard was expressly overruled in Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127 (1958), where the Supreme Court said that "the essential inquiry is whether the disabling injury or death is causally related to strain or an exertion attendant on doing the master's work. Did the accident come from disease alone, or did the employment contribute to it?" Id. at 135.
Ciuba was followed by Dwyer v. Ford Motor Co., 36 N.J. 487 (1962), which attempted to clarify the former decision and almost certainly enlarged upon the scope of compensable heart illness. In restressing the abolition of the "unusual strain" rule the Supreme Court in Dwyer said

Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127 (1958), did away with the need for proof that the heart attack was caused or contributed to by any unusual employment effort or strain. That rule was supplanted by the doctrine that if the attack is caused or precipitated or contributed to by the ordinary stress or strain of the employment, a compensable accident comes into being. Thus, when an employee is suffering from an acute, or passively progressive or quiescent, heart condition, and the ordinary routine exertion of *181 his regular work is too much for the heart, irrespective of whether the effort acts alone, or in conjunction or contribution with the weakness induced by the disease, to precipitate or accelerate or aggravate the attack, the resulting disability or death is within the statutory coverage. There is no requirement that the work effort be excessive in the sense of being unusual or not ordinarily engaged in. It is enough that a usual strain associated with the work was of itself too much at that time because of the condition of the heart, or that such routine effort in combination with the diseased condition of the heart produced the collapse. Compensability arises whenever the required exertion is too great for the man undertaking the work, whatever the degree of exertion or condition of his heart. [Emphasis supplied]. [36 N.J. at 491-492].
As to causation, the Dwyer Court required only that the "ordinary work effort" contributed in some material degree to the allegedly compensable event. Id. at 493. Dwyer also abolished any procedural presumption that the petitioner's coronary disability resulted from natural physiological causes. Id. at 506.
Despite the assertion of at least one commentator that "the pattern of awards and denials since the Ciuba and Dwyer cases indicates at least that the scrapping of the unusual-exertion requirement is not the signal for opening the floodgates to indiscriminate heart awards," Larson, 1B Workmens' Compensation Law, p. 7-191, § 38.64(b), others, notably employers and insurers, have criticized the "Ciuba-Dwyer" doctrine. See Note, Standards of Proof in the Heart Cases: The Dwyer Doctrine, 16 Rutgers L.Rev. 754, 764 (1962); Lefelt, "Workers' Compensation in New Jersey: A Critique of S-802," 104 N.J.L.J. 425, 438 (Nov. 15, 1979). In 1973, the New Jersey Workmen's Compensation Study Commission, composed of representatives from the AFL-CIO, Ford Motor Co., Liberty Mutual Insurance Company, the medical profession, and the practicing bar, issued a report in which it purportedly resisted pressure to overturn the impact of Dwyer. See Lefelt, supra, 104 N.J.L.J. at 425, 438.
By 1978, however, the Legislature was more receptive to the idea of changing the Ciuba-Dwyer doctrine. Senate Bill 802 (the original bill), introduced on February 9, 1978 before the Committee on Labor, Industry and Professions, stated in pertinent part that

*182 In any claim for compensation for injury or death from cardiovascular or cerebral-vascular causes, the claimant shall prove by a preponderance of the credible evidence that the work effort or strain alone involved an event or happening beyond the normal and routine duties of his employment, and in reasonable probability caused in a material degree the cardiovascular or cerebral-vascular injury or death resulting therefrom. It is presumed that injury or death from cardiovascular or cerebral-vascular causes is the result of natural physiological causes, and the burden is upon the claimant to prove by a preponderance of the evidence that the work effort or strain was the competent producing cause of the injury or death.
"Material degree" means an appreciable degree or a decree [sic] substantially greater than de minimus. [Emphasis supplied].
The emphasized language contained in the original bill, supra, clearly was meant to codify the language of Seiken, supra, 2 N.J. at 476, which stated that "something of an unusual strain or exertion beyond the mere employment itself is required to establish liability...." Thus, the original bill sought to reimpose the "unusual strain" rule in workers' compensation cases. However, this was not to be.
On October 15, 1979 the Committee on Labor, Industry and Professions reported out a substitute for the original Senate 802 which provided in pertinent part that
In any claim for compensation for injury or death from cardiovascular or cerebral vascular causes, the claimant shall prove by a preponderance of the credible evidence that the injury or death was produced by the work effort or strain involving a substantial event[[1]] or happening in excess of the wear and tear of the claimant's daily living and in reasonable medical probability caused in a material degree the cardiovascular or cerebral vascular injury or death resulting therefrom.
Material degree means an appreciable degree or a degree substantially greater than de minimus. [Emphasis added].
Accompanying this substitute bill (as well as Assembly Bill 840, which was identical to the substitute bill) was the previously noted Joint Statement of the Senate Labor Industry and Professions Committee which declared the Legislative intent to "put significantly more money into the hands of the more seriously injured workers while providing genuine reform and meaningful cost containment for New Jersey employers from *183 unjustified workers' compensation costs that are presently among the highest in the nation." The Joint Statement stated that the substitute bill "would benefit employers by ... (2) countering the far reaching effects of Dwyer v. Ford in cardiac claims by requiring that a petitioner prove that the injury or death involved substantial effort or strain which was in excess of the rigors of the claimant's daily living and that the cause of injury or death was job-related in a material degree...." Joint Statement at 2.
Against this background, we find the award of 7 1/2% of permanent partial total disability under N.J.S.A. 34:15-7.2 to be unwarranted. In commenting on petitioner's expert internist's testimony, the judge said
He bases this on the fact that the Petitioner testified she only had occasional pains before which went away with nitro and now she had more intense pain which was not always helped by the nitro. He gave no scientific basis or proof of aggravation, although said the aggravation came from narrowing of the arteries by the disease which he admitted was preexisting and spasm in the arteries which would cause the ischemia and pain. These are explanations, of course, of the progression of the disease and the nature of the disease which preexisted and were not traumatic in origin.
With these findings, we cannot square this award of permanent disability with the expressed will of the Legislature.
We reverse the award of permanent total disability.
NOTES
[1] As finally enacted, this passage reads "substantial condition, event or happening...." L. 1979, c. 283, § 3, eff. Jan. 10, 1980.